## Case No. 12,855.

### SILVERMAN'S CASE.

[2 Abb. U. S. 243; [1] 1 Sawy. 410; 4 N. B. R. 522 (Quarto, 173); 13 Int. Rev. Rec. 52.]

District Court, D. Oregon. Nov. Term, 1870.

CONSTITUTIONAL LAW — ACTS OF BANKRUPTCY—
PLEADING.

1. The constitutional grant of power to congress, to establish uniform laws on the subject of bankruptcy, is not limited to passing enactments similar in scope and operation to those in force in England, when the constitution was adopted. It gives congress plenary power over the subject of bankruptcy; under one limitation only, that the laws passed upon that subject shall be uniform throughout the United States.

2. The reasons why this power should be vested in the national government,—explained.

3. Under the constitution and and all uniform legislation, tending to promote the distribution of an insolvent debtor's assets among his creditors, and his discharge from their demands, is within the power of congress.
[Cited in Re Reiman, Case No. 11,673; Re California Pac. R. Co., Id. 2,315.]

4. The wisdom and soundness of the policy of allowing insolvent debtors to dictate preferences in the distribution of their assets,—questioned.

5. In the district court, sitting as a court of bankruptcy, pleadings must be special. Hence, a mere general denial of the intent with which an act relied upon as an act of bankruptcy is alleged to have been done, is not a good defense to the charge; but the respondent must also allege and prove with what intent he did such act.

6. When the unlawful intent is the necessary consequence of the act charged, as in the case of a payment of one creditor by an insolvent debtor, a mere denial of such intent is no answer to the petition, and judgment may be given against the respondent as upon a failure to answer.

7. Inasmuch as every man is presumed to intend the necessary consequences of his acts, a debtor who has paid one creditor to the exclusion of others, cannot be heard to say that he did not intend to give such creditor a preference. The necessary effect of such payment is, to give a preference. Judgment may be given against a respondent whose answer sets up no other matter of defense than the denial of the intent, as upon failure to answer.
[Cited in Re Seeley, Case No. 12,628; National Security Bank v. Price, 22 Fed. 699.]

Petition in involuntary bankruptcy.

Mr. Fechheimer, for the petition.
Mr. Stout, opposed.

DEADY, District Judge. On December 7, 1870, Livingston and Levy, doing business as the firm of Livingston & Co., at San Francisco, filed a petition in bankruptcy against Charles

---

[1] [Reported by Benjamin Vaughan Abbott, Esq., and here reprinted by permission.]

A. Silverman, praying that he might be adjudged a bankrupt.

It appears from the petition that the debt due from Silverman to the petitioner amounts to five hundred and thirty-one dollars and fifty cents, for goods sold and delivered to Silverman in February, 1869, and that Silverman has since committed the following acts in bankruptcy:

First. That on or about November 15, 1870, Silverman sold and transferred his property to certain persons, to wit: an undivided one-fourth of the property and effects of the Oregon Dray Company, with intent to thereby hinder, delay, and defraud his creditors; and with the intent to delay and defeat the bankrupt act.

Second. That on or about November 16, 1870, Silverman being insolvent, paid Wasserman & Co., one of his creditors, the sum of one hundred dollars, with intent to thereby give a preference to Wasserman & Co.

On December 16, 1870, Silverman answered the petition, denying that he sold his property or made the payment to Wasserman & Co., with the intent in the petition alleged.

On the same day the petitioner filed a motion for judgment on the pleadings, upon the ground that the answer of Silverman in fact admitted the acts of bankruptcy charged in the petition; and on December 28 the motion was argued and submitted.

Upon the argument, counsel for the debtor confidently asserted that congress had no power to pass a bankrupt law applicable to other persons than traders, and that an insolvent person had a natural right to dispose of his effects as he chose, and by such disposition to prefer one creditor to another. Counsel cited no authority in support of the objection to the constitutionality of the act, but maintained generally that the power of congress in the premises was limited to the passing of such bankrupt acts as were in force in England at the time of the formation and adoption of the constitution, and that these did not apply to any one except traders.

The constitution (article 1, § 8) provides: "The congress shall have power * * * to establish * * * uniform laws on the subject of bankruptcies throughout the United States."

If language means anything, this is something more than the power to re-enact the particular bankrupt act then in force in Great Britain. It is a grant of plenary power over the "subject of bankruptcies." Now the subject of bankruptcies includes the distribution of the property of the fraudulent or insolvent debtor among his creditors, and the discharge of the debtor from his contracts and legal liabilities, as well as all the intermediate and incidental matters tending to the accomplishment or promotion of these two principal ends. Congress is given full power over this subject, with the one qualification, that its laws thereon shall be uniform throughout the United States. Whether these laws shall apply to

all fraudulent or insolvent debtors or only to such as are engaged in trade, is committed by the constitution to the wisdom and discretion of the law-making power. This may be illustrated by reference to the clause in the section above quoted whereby the constitution gives congress power "to establish post-offices and post-roads."

Is this to be considered a plenary grant of power over the subject of the collection, conveyance, and delivery of all such letters, newspapers, and other things, as in the progress of society it may be found useful and convenient to transmit from place to place by public post; or does it merely authorize congress to establish and maintain such a meagre and primitive postal system as was then established in Great Britain by act of parliament? It seems to me it is only necessary to state the latter conclusion or proposition, to show its absurdity.

If the power to establish post-offices and post-roads is not full power over the subject, to be exercised from time to time, according to the varying demands and necessities of society, then it is clear, upon the argument against the bankrupt act, that carrying the mail by steam, carrying it by railway, transmitting books through it, and dispatching it daily, are all unconstitutional, for the system in force in England at the adoption of the constitution provided for none of these things.

In Re Klein, decided in the circuit court for the district of Missouri, and reported in 1 How. [42 U. S.] 277, Mr. Justice Catron held the bankrupt act of 1841 [5 Stat. 440], which was not restricted to traders, to be constitutional. In that case, the objection to the act was twofold: First. That it allowed the debtor to avail himself of the benefit of the act upon his own petition; and, Second. That it was not restricted to traders—contrary in both particulars to the provisions of the English act. In considering these objections, the learned judge said:

"If the power conferred on congress carries with it these restrictions, then the district court properly refused to discharge the applicant, Klein, because the act of congress was unconstitutional in his case. But other and controlling considerations enter into the construction of the power; it is general and unlimited; it gives the unrestricted authority to congress over the whole subject, as the parliament of Great Britain had it, and as the sovereign states of this Union had it before the time when the constitution was adopted. * * * The district court relied confidently on the ground, that congress can pass no law violating contracts; and that the clause of the constitution conferred no such authority, because the English bankrupt laws, by which the power is supposed to be restricted, only permitted the contract to be annulled at the election of four parts in five of the creditors in number and value; and therefore, they annulled it by a new contract. This argument proceeds on the assumption, that a proceeding in bankruptcy can only be had at the election of and for the benefit of creditors; and that every material step is their joint act; to which the debtor is compelled to submit. For the present it will only be necessary to say, that one prominent reason why the power is given to congress, was to secure to the people of the United States, as one people, a uniform law, by which a debtor might be discharged from the obligation of his contracts, and his future acquisitions exempted from his previous engagements; that the rights of debtor and creditor equally entered into the minds of the framers of the constitution. The great object was to deprive the states of the dangerous power to abolish debts. Few provisions in the constitution have had more beneficial consequences than this, and the kindred inhibition on the states, that they should pass no law impairing the obligations of contracts. The inhabitants of states producing largely, must be creditors; the inhabitants of those that are consumers, will be debtors. Bankrupt laws of the latter states might ruin the producers and creditors. They having no interest or power in the government of the consuming states, and it being the interest of the latter to annul the debts of non-residents, no remedy would exist for the grossest oppression. No laws of relief would be more effectual in time of pressure by foreign creditors, nor more likely to be adopted. If one state adopted such a measure, it would furnish a fair occasion for others to do the same, on the plausible pretext of self-defense; others would be forced into a similar bad policy, until discredit and ruin would overspread the entire land, by an extinction of all debts, and a consequent prostration of morals, public and private, on the subject of contracts. This evil had, to a certain extent, occurred, and was fresh in the minds of the framers of the constitution; and no doubt it would again occur in some of the states but for the provisions under consideration standing in the way of abrogating the private contracts of non-residents. But if congress passed the law, it must be uniform throughout the United States; then the entire people are equally represented, and have the power to protect themselves against hasty and mistaken legislation, by its repeal, if found oppressive in practice. * * * In considering the question before me, I have not pretended to give a definition; but purposely avoided any attempt to define the mere word bankruptcy. It is employed in the constitution in the plural, and as a part of an expression—'the subject of bankruptcies.' The ideas attached to the word in this connection are numerous and complicated; they form a subject of extensive and complicated legislation; of this subject congress has general jurisdiction, and the true inquiry is—to what limits is that jurisdiction restricted? I hold, it extends to all cases where the law causes to be distributed the property of the debtor among his creditors; this is its least limit; its greatest is the discharge of a debtor from his contracts. And

all intermediate legislation, affecting substance and form, but tending to further the great end of the subject—distribution and discharge —are in the competency and discretion of congress. With the policy of a law letting in all classes—others as well as traders—and permitting the bankrupt to come in voluntarily, and be discharged without the consent of his creditors, the courts have no concern; it belongs to the law-makers."

The natural right of an insolvent to dispose of his property as he chooses, is not exactly pertinent to the question before the court; but as counsel seem disposed to attach some importance to the claim, and made it the basis of an indirect attack upon the justice and policy of the act, if not its constitutionality, it may be well to inquire if there is any such right. Whence comes the property of an insolvent? A moment's reflection will satisfy any one that it represents in whole or in part the credit given to the insolvent by his creditors, and therefore, in good morals, belongs to them, and not him. Strictly and truthfully speaking, an insolvent has no property, and therefore, he has no natural right to dispose of the property in his possession otherwise than with the consent of the real owners—his creditors.

I know that, after a series of conflicting decisions, it was established at common law, that a debtor in failing circumstances might prefer a creditor. But the doctrine and practice were never regarded as consonant with good morals, and by the intervention of the legislature in the enactment of bankrupt and insolvent laws, the contrary rule has been generally established. In Cunningham v. Freeborn, 11 Wend. 256, Mr. Justice Nelson, upon this subject, and the kindred one of voluntary assignments, says:

"The root of the vice in all these cases of voluntary assignments by failing debtors lies in the principle of preference. It affords the pretense for putting the property into the possession of a friendly trustee, and thereby may substantially secure to the debtor the control of it for a long time after the law presumes it to have passed from him, and when his own possession would be incompatible with its security. In Estwick v. Caillaud, 4 Term R. 424, Lord Kenyon said, that 'it was neither illegal nor immoral to prefer one kind of creditors to another.' The soundness of this proposition loses some of its weight, when advanced in a case one would be apt to select above all others to illustrate the reverse; but I can well imagine one that would justify it. As a general proposition, however, the experience and observation of mankind must bear witness against it; and no one knew better than his lordship, and those familiar with courts of justice, how frequently the principle is perverted and made subservient to the gratification of vindictive feelings and the foulest ingratitude, as well as injustice towards honest and confiding creditors."

The answer of the debtor impliedly admits the indebtedness and insolvency as alleged in the petition, as well as the debtor's property and the payment of one of his creditors, and simply denies that such sale or payment was made with the intent to defraud or prefer.

Counsel for petitioner, assuming that these denials, or some of them, are mere traverses of conclusions of law from the facts admitted, asks that they be disregarded, and that judgment be given against the debtor notwithstanding, in accordance with the prayer of the petition.

It is a well settled rule of pleading that a traverse or denial must not be taken on a mere matter or conclusion of law, for the effect would be to submit the question of law to the jury rather than the court. But when the conclusion is a mixed one of law and fact, then it is clearly traversable, and the issue raised thereby triable by a jury under the directions of the court as to the law. 1 Chit. Pl. 645; 2 Estee, Pl. & Prac. 660. But under rule 36 of this court, which provides that "all pleadings and allegations of fact shall be special and verified," a simple denial of the intent alleged in the petition is not, in any case, a sufficient defense thereto.

If the debtor, notwithstanding the admitted circumstances, did not sell his property, or make the payment complained of, with the intent alleged by the petitioner, he should state with what other intent he did make such sale or payment. By this means the petitioner will be apprised of what the particular defense is, and come prepared to meet it at the trial, or if he thinks it insufficient in law he may demur to it. In this way much unnecessary trouble, vexation, delay, and expense is saved to both parties. For instance, if such were the fact, the debtor might allege in his answer that he sold his property as in the petition alleged, for the purpose and with the intent of investing the proceeds in real property in Portland, or for the purpose of loaning the sum on note and mortgage, or investing it in the public funds, as he might lawfully do, and not with the intent to thereby hinder, delay, and defraud his creditors, as alleged in said petition.

The sale of his property by a debtor is not necessarily an act of bankruptcy. It depends upon the intent with which it is done, and as this intent is not a mere conclusion of law, but of law and fact compounded, it may be traversed or denied, and the matter tried by a jury under the direction of the court as to the law. Yet it is probable that the act should be so construed as to hold any disposition of a debtor's property to be, prima facie, fraudulent, and contrary to the act, and thereby put the burden of proof upon the debtor to show that the same was done with a lawful intent, and is therefore not an act of bankruptcy. Such, at least, seems to be the necessary effect of the provision in section 41, which in terms declares,

that upon the trial of a petition in involuntary bankruptcy the debtor shall be adjudged a bankrupt, unless he proves the facts set forth in the petition not to be true.

But, as has been shown, under the rules of this court a mere general denial of the intent with which Silverman is alleged to have sold his property is not a sufficient plea, but the same must not only traverse the intent alleged, but must state with what other intent it was in fact done. Still I think that when the act is indifferent—not necessarily unlawful, contrary to the statute—that a general denial of the unlawful intent alleged is sufficient to raise an issue and prevent the petitioner from having judgment on the pleadings as for want of an answer. The defect in the answer should be taken advantage of by demurrer. But if the parties choose to go to trial upon such a plea, proof of a lawful intent can be made under it.

So far, then, as the first act of bankruptcy alleged is concerned, the motion must be denied.

As to the payment of the one hundred dollars to the creditor of Silverman, I am satisfied, upon the facts admitted, that he must be conclusively presumed to have intended to give such creditor a preference. The necessary effect of such payment is to give a preference. I cannot conceive of any circumstances under which an insolvent debtor can make a payment to one of his creditors without intending to thereby prefer such creditor, unless it be when the debtor is ignorant at the time of his insolvency. In this case the debtor admits that he was insolvent at the time he made this payment, and there is no pretense that he was not aware of it. Indeed, he is presumed to know it until the contrary appears. Under these circumstances, a mere denial of the intent to give a preference is a traverse of a conclusive presumption of law, and therefore frivolous and immaterial.

In Cunningham v. Freeborn, cited above, it was alleged in the bill that a certain voluntary assignment was made with a fraudulent intent. The answer of the defendant admitted the assignment, but denied the intent. The case was heard on bill and answer, and in the course of the opinion, the court held that the admission of facts which are per se fraudulent in judgment of law, "are as much so and as conclusive upon the defendant as if he had in express terms admitted a fraudulent intent in his answer; and, in such case, any subsequent disclaimer of such intent will not avail him."

In Re Drummond [Case No. 4,093], it was held that a payment by an insolvent debtor to one of his creditors necessarily gave such creditor a preference, and that the debtor, being presumed to know the consequence of such act, was conclusively presumed to have intended it.

In Driggs v. Moore [Id. 4,083], there was a similar ruling. The syllabus states the conclusion of the court, in these words: "If, from the circumstances under which the mortgage was given, it must necessarily have operated as a preference, the creditor will not be heard to say, in support of the transaction, that the debtor did not intend to create one."

In Campbell v. Traders' Bank [Case No. 2,-370], H. & E., being insolvent, gave their note, with a warrant to confess judgment thereon, in settlement of a debt due the Traders' Bank. Drummond, J., held, that H. & E. must have intended to give a preference to the bank. In the course of the opinion he says: "It is to no purpose that a man says, when he is insolvent, and signs a note and warrant of attorney, and gives it to his creditor, the effect of which is to enable a creditor to enter up judgment, and issue execution, and levy on his property, that he did not intend to give a preference. Actions in this, as in so many other cases, speak louder than words; and the conclusion necessarily follows, from such a state of facts, that he does intend to do what is the reasonable consequence of what he does, or, according to the oft-repeated statement of the books, a man is supposed to know what is the necessary consequence of his own acts."

In Re Smith [Case No. 12,974], among other things, the petition alleged that Smith, being insolvent, made a voluntary general assignment of his property for the benefit of all his creditors, with the intent to defraud or delay the operation of the bankrupt act, and to prevent his property from being distributed according to the provisions of said act. In answer to this allegation, the respondent pleaded that such assignment was made without preference, for the sole purpose of having his creditors share equally his property, in proportion to their debts, and not with the intent alleged in the petition. The petitioner moved for judgment on the pleadings, and the motion was allowed. Hall, J., in the course of his opinion, after demonstrating that such an assignment, if upheld, would necessarily and absolutely defeat the operation of the bankrupt act, says: "There can be no possible doubt that the execution of the general assignment, under the circumstances of this case, was an act of bankruptcy; and the only question upon which there can be the slightest doubt is, whether, in the absence of any rebutting proof—and even in the absence of a replication to the respondent's answer—the denial of the intention imputed to him, and which is necessary to constitute the act of bankruptcy, must not prevent an adjudication until the question of intention has been submitted to a jury."

Every person of a sound mind is presumed to intend the necessary, natural, or legal consequences of his deliberate act. This legal presumption may be either conclusive or disputable, depending upon the nature

of the act and the character of the intention. And when, by law, the consequence must necessarily follow the act done, the presumption is ordinarily conclusive, and cannot be rebutted by any evidence of want of such intention. See, also, In re Sutherland [Case No. 13,638], decided in this court.

In opposition to these cases, no authority is cited by counsel for respondent. He rests his case upon the narrow ground, that because the intent to prefer is a necessary ingredient in the act of bankruptcy, it may be denied, and tried as an issue of fact. But this assumes that the presumption which the law makes from the facts admitted—namely, that a preference was intended—is only a disputable presumption, and may therefore be controverted. If, however, the preference is a necessary consequence of the payment, the law conclusively presumes the intent to prefer. This position is correct beyond a doubt, upon both reason and authority. Now, that the giving of a preference is a necessary consequence of the payment by an insolvent debtor of one of his creditors, is self-evident. Argument cannot make the matter plainer than the statement of the proposition. The creditor is preferred, because he has received his debt and his fellow creditors have not. The debtor, being insolvent, has not the means to pay them, and by paying one in full, he has defrauded the others of their just proportion of his estate. Other motives may also have actuated the debtor, but that makes the payment none the less a preference. Indeed, he may expect to become able in time to pay all his creditors in full, and may intend to do so as soon as he can, but this does not affect the question. The creditor whose debt is paid is nevertheless preferred over his fellows. He has his money, but they must depend upon the often double uncertainty of whether their debtor will in time become both able and willing to pay their debts in full.

Notwithstanding the length of this opinion, I cannot omit to notice the oft-repeated declaration of counsel for respondent that proceedings in bankruptcy are quasi criminal, and must be strictly construed in favor of the respondent. If any part of the act should be so construed, it is section 39, which provides for involuntary adjudication.

In Re Locke [Case No. 8,439], Lowell, J., in speaking of this section, says: "It is highly remedial, and should be construed liberally in favor of creditors, because its scope and purpose are to oblige insolvent traders to take advantage of the act, and thus insure an equal distribution of their estate under its carefully framed provisions."

In Re Muller [Id. 9,912], decided in this court, in reply to a similar argument from counsel against the operations of the act, the court said: "In my judgment, this view of the matter is not supported by reason or

authority. The act does not attempt to punish the bankrupt, but to distribute his property fairly and impartially between his creditors, to whom in justice it belongs. It is remedial, and seeks to protect the honest creditor from being overreached and defrauded by the unscrupulous. It is intended to relieve the honest but unfortunate debtor from the burden of liabilities which he cannot discharge, and allow him to commence the business of life anew. The power to pass laws on 'the subject of bankruptcies' is one of the express grants of power to the national government; and history teaches that the want of a uniform law on this subject throughout the states, was one of the prominent causes which led to the assembling of the constitutional convention and consequent formation and adoption of the federal constitution.

"Such a statute is not to be construed strictly as if it was an obscure or special penal enactment, and this was the sixteenth instead of the nineteenth century. The act establishes a system, and regulates, in all their details, the relative rights and duties of debtor and creditor. Such an act must be construed—as indeed should all public acts—'according to the fair import of its terms, with a view to effect its objects and to promote justice.'"

The petitioner is entitled to judgment declaring the respondent a bankrupt, on the ground of having paid Wasserman & Co., with intent to give them a preference.

Order accordingly.